IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUANTUM CORPORATION, | No. C 14-04293 WHA |
| Plaintiff and Counter-Defendant, | |
| v. | **ORDER RE CROSSROADS' MOTION TO STRIKE** |
| CROSSROADS SYSTEMS, INC., | |
| Defendant and Counter-Plaintiff. | |

### INTRODUCTION

In this patent infringement action involving data storage systems, the accused infringer seeks relief from gamesmanship perpetrated by the patent holder's claim construction expert. For the reasons stated below, certain relief is **GRANTED**.

### STATEMENT

Plaintiff and counter-defendant Quantum Corporation owns U.S. Patent No. 6,766,412 ("the '412 patent"), directed to data storage systems such as tape libraries. Quantum alleges that defendant and counter-plaintiff Crossroads Systems, Inc., manufactures and sells a series of infringing data storage products, known collectively as the StrongBox VSeries Library Solution.

Quantum disclosed its preliminary claim construction positions and extrinsic evidence in support of those positions, as required by Patent Local Rule 4-2 in May 2015. With that disclosure, Quantum identified Dr. Andrew Hospodor as an expert who would provide opinions on the meaning of certain claims (Roberts Decl., Exh. A). Quantum also provided a summary of Dr. Hospodor's opinions (*id.*, Exh. B).

In July, Crossroads deposed Dr. Hospodor, using the summary of his opinions as a guide. The deposition began this way (Hospodor Dep. at 8–9):

> Q. And do you — do you understand that the topic today has to do with claim construction in this matter? Is that your understanding?
>
> A. The topic, it is my understanding, has to do with what was known in the art in 2001.
>
> *            *            *
>
> Q. So your — your understanding is here is that you're only here to testify with respect to prior art? Is that —
>
> A. My understanding is that I'm here with respect to what was known of one skilled in the art in 2001 and provide facts along that — those lines.

As counsel for Crossroads began to develop the substance of his opinions, Dr. Hospodor resisted the idea that he was testifying about the meaning of claim terms (*id.* at 61–62):

> Q. But as I understood your prior testimony, you are not going to give an opinion as to the meaning of claim terms; correct?
>
> A. Not in this deposition.
>
> Q. Well, are you going to give one at the claim construction hearing?
>
> A. I have not been. I have not been asked.
>
> Q. Okay. And you understand if you don't provide us with the opinions here, you won't be allowed to provide — provide an opinion at the claim construction hearing? Do you understand that?
>
> A. Yeah, I don't — I don't know if I'm going to be opining or — either way.
>
> Q. But right — right now, and I just want to be clear about this, you're — you are not — you don't have opinions today for purposes of this deposition with respect to the meaning of the claim terms in the '412 patent?
>
> A. I'm not going to be providing definitions for the claim terms in the '412 patent. I don't have opinions on the meanings of those claim terms today.

Counsel for Crossroads asked Dr. Hospodor whether his opinions, as expressed in the summary disclosed by Quantum, had any relationship to the claim construction issues in the case, but the

witness was cautioned not to reveal privileged information and ultimately answered only as follows (*id.* at 65–66):

> Q. Yeah. Yeah. So here's — here's — and Exhibit 8, as we previously discussed, contains your opinions in this litigation.
>
> A. Yes.
>
> MR. ROGOYSKI: Objection to form. Same — same privilege objection. Again, if you can answer that question without referring to privileged information you may do so. Otherwise don't answer it.
>
> THE WITNESS: These opinions are relevant to the descriptions that are given in the '412 patent.
>
> Q. Do they relate to claim construction? Your opinions.
>
> A. I have not come up with opinions on claim construction at this time.

Dr. Hospodor maintained this distinction when asked about specific claim terms (*e.g.*, *id.* at 107–08):

> Q. Let's go to the next bullet [of the summary of his opinions]. "At the time of the invention, 'logic circuitry' was a technical term that could comprise a variety of specific components and functions. References to 'logic circuitry' was a technical term that could comprise a variety of specific components and functions. References to 'logic circuitry' did not imply that the component(s)" — s in parens — "was unique to a particular system or subsystem, nor that the component(s)" — s in parens — "functionality could not be shared by multiple systems or subsystems." Do you see that?
>
> A. Yes.
>
> Q. What is the relationship between that opinion and the '412 patent, if any?
>
>     *     *     *
>
> Q. What's the — why are you giving this opinion?
>
> A. Oh. I'm trying to establish an understanding that "logic circuitry" was a technical term at the time of the art in 2001 that could comprise a variety of different components, specific components and functions; and that this doesn't imply that the specific components were unique to anything. Nor that the component functionality could not be shared. That's all it says.

3

> Q. Okay. But as you stated earlier, this does not have to do with claim construction; correct?
>
> A. So I am not offering an opinion on a claim term here.

Dr. Hospodor's testimony about other terms followed suit, drawing a distinction between claim construction versus how those skilled in the art would have understood terms used in the patent in 2001.

Although the witness drew this distinction, he vagued out when asked to explain the experience and educational level of one skilled in the art (*id.* at 152):

> Q. In your opinion you refer to a person of ordinary skill. Who was a person of ordinary skill at the time of the invention?
>
> A. I don't think I've — I don't think I've created an opinion absolutely on what a person of ordinary skill in the art would be at the time of the invention. I can tell you about my skill, what I do.
>
> Q. Do you have an opinion as to what — who, for example, the experiences or the educational background of one of ordinary skill in the art at the time of the invention?
>
> A. I haven't created that opinion yet.

Counsel for Quantum tried to fix this gaffe on his follow-on examination, evidently after some woodshedding (*id.* at 180–82) (objections and colloquy omitted):

> Q. A little while ago you were asked about a person of ordinary skill in the art, and you said that you had not formed an opinion yet on what a person of ordinary skill in the art would be defined as. Do you recall that?
>
> A. Yes.
>
> Q. Do you consider yourself to be at least a person of ordinary skill in the art with respect to this patent?
>
> A. Yes, I do.
>
> Q. When you were working in the data storage industry with tape library technology, did you know other people who you would consider to be persons of ordinary skill in the relevant art?
>
> A. Yes.
>
> Q. What concepts would a person of ordinary skill need to be comfortable with in order to understand the technology in the '412 patent?
>
> A. So for a person to be comfortable with the technology in the '412 patent, I believe they would have to be knowledgeable in data

4

> storage, data storage devices, computer networking, computer architecture, and have a background in systems that includes both hardware and software.
>
> Q. What kind of hardware would they need to know about?
>
> A. The different types of interfaces used, the different types of storage devices, the drives themselves. The interconnection strategies and then the individual components that are used to make the subsystem
>
> Q. Would a person of ordinary skill need to be familiar with tape libraries?
>
> A. I believe that a person of ordinary skill in the art within the context of the '412 patent would be knowledgeable in tape libraries, yes.
>
> Q. How many years of experience would they need working with tape libraries in order to be comfortable understanding the concepts in the '412 patent?
>
> A. So I would say at least two years. And preferably with a bachelor's degree in computer science, computer engineering, or electrical engineering.

In other words, the witness had no opinion when Crossroads asked the question but had opinions aplenty when Quantum asked the same question later in the deposition.

Quantum served its opening claim construction brief together with a 38-page declaration from Dr. Hospodor. That declaration included a section with the heading "Claim Construction Analysis," in which he provided definitions for numerous terms according to the understanding of a person of ordinary skill in the art in 2011. That analysis was organized under sub-headings of specific claim language (Hospodor Decl. at 9). Quantum's claim construction brief cited Dr. Hospodor's opinions on numerous occasions.

Crossroads now moves to strike Dr. Hospodor's declaration in support of Quantum's opening claim construction brief and to preclude Dr. Hospodor from testifying on claim construction. This order follows full briefing and oral argument.

**ANALYSIS**

Crossroads argues that Dr. Hospodor's declaration should be stricken in its entirety and that he should be precluded from testifying on any claim construction. *First*, Crossroads argues that Dr. Hospodor's declaration in support of Quantum's claim construction brief contains claim

1 construction opinions, although he insisted he did not have any opinions on claim construction at the time of his deposition. *Second*, Crossroads argues that Dr. Hospodor gave opinions rebutting Crossroads' proposed constructions in his declaration, although he claimed he had no such opinions at his deposition. Each argument is addressed in turn.

### 1. DR. HOSPODOR'S AFFIRMATIVE OPINIONS.

In his declaration in support of Quantum's claim construction briefing, Dr. Hospodor took his opinions about the meaning of the certain terms according to a person of ordinary skill in the art in 2001, which he gave at his deposition, and organized them under a framework entitled "Claim Construction Analysis." Within that section of his declaration, he organized his thoughts under bold headings of actual claim language. Crossroads argues that by organizing his thoughts in this manner, he is inherently giving an opinion about claim construction, although he testified at his deposition, "I have not come up with claim construction opinions at this time" (Hospodor Dep. at 66). Accordingly, Crossroads seeks to strike Dr. Hospodor's declaration and to preclude him from testifying in support of Quantum's proposed claim constructions.

Quantum responds that Dr. Hospodor offered his opinion about the meaning that a person of skill in the art in 2001 would ascribe to the terms in the specification of the patent, which are also claim terms, but he carefully stopped short of offering a legal conclusion as to the proper construction of claim terms, which is the "province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The Supreme Court has held that "if a district court resolves a dispute between experts and makes a factual finding that, in general, a certain term of art had a particular meaning to a person of ordinary skill in the art at the time of the invention, the district court must then conduct a legal analysis: whether a skilled artisan would ascribe that same meaning to that term *in the context of the specific patent claim under review*." *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. ___, 135 S. Ct. 831, 841 (2015) (emphasis in original). The Federal Circuit, applying the Supreme Court's decision, held that a district court should not defer to an expert's testimony about the ultimate conclusion of the proper construction of a claim. *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015). Nothing in that decision precludes such testimony.

6

Dr. Hospodor's declaration generally offers opinions about the meaning that a person of ordinary skill in the art would have ascribed to claim terms in 2001. He answered questions about those opinions at his deposition and was generally willing to engage in a debate over those opinions, which may prove useful in resolving the ultimate legal question of claim construction. On the other hand, Dr. Hospodor indicated an unwillingness to engage in a debate over claim construction generally. For example, Dr. Hospodor was asked how his definition of "logic circuitry" related to the '412 patent. He responded that he was trying to establish an understanding of that term as used in the art in 2001. When asked whether it related to claim construction, he responded, "[s]o I am not offering an opinion on a claim term here" (Hospodor Dep. at 108).

The Court is disappointed that Quantum has played this game of drawing such a fine distinction, that is, purporting to opine only on how a term was understood in the field in 2001 and eschewing any and all opinions on claim construction only to organize his opinions later on precisely as opinions on claim construction. At the deposition, Crossroads had the right to subject this opinion to cross-examination, such as by asking if *other* phrases used in the specification or claims should modify that supposed understanding or whether some development in the art prior to 2001 would have limited or changed his understanding. The problem is that Crossroads neglected to ask any such questions, electing to rest on the generic refusal to engage in claim construction. The Court is disappointed that Crossroads neglected to make a better record. All Crossroads had to do was to ask a few pointed questions — but it failed to do so.

    **2.**    **DEFINITION OF ONE SKILLED IN THE ART.**

The sequence of questioning at the deposition reveals that Dr. Hospodor refused to opine on the subject of the definition of one skilled in the art while under examination by Crossroads, but later on he had plenty of opinions on the subject when asked about it by his own counsel. No doubt a convenient break provided a moment to woodshed the witness.

    **3.**    **DR. HOSPODOR'S REBUTTAL OPINIONS.**

7

In his most recent declaration, Dr. Hospodor also offered several arguments rebutting specific constructions proposed by Crossroads, which are supported by the testimony of Crossroads' own expert, Dr. John Levy (*e.g.*, Hospodor Decl. ¶ 51). Crossroads is correct that the summary of its expert's claim construction testimony, which it provided to Quantum in advance of Dr. Hospodor's deposition pursuant to Patent Local Rule 4-2, was adequate to put Dr. Hospodor on notice of what Dr. Levy would say. Quantum's argument that Dr. Hospodor needed to wait until Dr. Levy was deposed to compose his rebuttal arguments is most unpersuasive. Accordingly, Dr. Hospodor should have been prepared to answer questions about Dr. Levy's opinions at his deposition.

Crossroads, however, only raised this problem for the first time in its reply brief on its motion to strike and made no mention of the rebuttal issue in its opening memorandum. Crossroads deprived Quantum of an opportunity to respond to this argument in its opposition, a form of sandbagging.

**CONCLUSION**

The record is not strong enough to warrant striking the declaration but the gamesmanship at issue warrants the following relief. Within **TWO WEEKS** of this order, Dr. Hospodor shall sit for three hours of more deposition at the law offices of Crossroads, both sides to absorb their own costs (and Quantum to absorb the cost of Dr. Hospodor's travel and time), failing which the declaration will be stricken. This order is without prejudice to the distinct possibilities that the jury will be allowed to learn of Dr. Hospodor's gamesmanship and that the judge will also take it into account on claim construction.

Within **TWO WEEKS** after the deposition, Crossroads may file a supplemental brief on claim construction based on the new deposition testimony.

**IT IS SO ORDERED.**

Dated: September 29, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE